IN THE SUPREME COURT OF THE STATE OF DELAWARE

| | | |
|---|---|---|
| IN RE DELAWARE PUBLIC SCHOOLS LITIGATION | § § § § § § § § | No. 138, 2023<br><br>Court Below: Court of Chancery of the State of Delaware<br><br>C.A. No. 2018-0029 |

Submitted: November 15, 2023
Decided: January 30, 2024

Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, Justices, and **JONES**, Judge[1] constituting the Court *en Banc*.

Upon appeal from the Court of Chancery. **AFFIRMED in part; REVERSED in part**.

Max B. Walton, Esquire (*argued*), Lisa R. Hatfield, Esquire, Erica K. Sefton, Esquire, Connolly Gallagher LLP, Newark, Delaware. Wilson B. Davis, Esquire, New Castle County Law Department, New Castle, Delaware, *for Appellant Michael R. Smith, Chief Financial Officer of New Castle County*. Krista M. Reale, Esquire Margolis Edelstein, Wilmington, Delaware, *for Appellant Gina Jennings, Finance Director for Sussex County*. Craig T. Eliassen, Esquire, Gary E. Junge, Esquire, Schmittinger & Rodriguez, P.A., Dover, Delaware *for Appellant Susan Durham, Director of Finance of Kent County*.

Richard H. Morse, Esquire (*argued*), Community Legal Aid Society, Inc., Wilmington, Delaware. Dwayne Bensing, Esquire, ACLU Foundation of Delaware, Inc., Wilmington, Delaware; *Of Counsel* Saul P. Morgenstern, Esquire, Peta Gordon, Esquire, Arnold & Porter Kaye Scholer LLP, New York, New York *for Appellees DEO and NAACP-DE*.

Paul E. Bilodeau, Esquire, Reger, Rizzo, Darnall, LLP, Wilmington, Delaware, *for Amicus Curie, The Delaware League of Local Governments*.

**VALIHURA, J.**

---

[1] Sitting by designation under Del. Const. art. IV, § 12 and Supreme Court Rules 2(a) and 4(a) to complete the quorum.

*INTRODUCTION*

This is an appeal of a March 28, 2022 order and a March 29, 2023 fee award by the Court of Chancery holding that Appellees were entitled to $1,476,001.88 in attorneys' fees and an additional $73,470.02 in uncontested expenses, for a total award of $1,549,471.90.[2] The legal fees arise from several lawsuits brought by two non-profit organizations that sought increased funding for Delaware's public schools.[3] The suits were brought against multiple Delaware public officials in their official capacities, some of whom were responsible for tax collection in Delaware's three counties.[4] Appellants ask us to determine whether the Court of Chancery erred in awarding attorneys' fees and expenses to Appellees. The parties in this appeal raise important questions regarding fee-shifting in the public interest litigation context.

For the reasons set forth herein, we REVERSE the decision of the Court of Chancery as to the award of attorneys' fees and AFFIRM its award of uncontested expenses.

---

[2] Opening Br.; Ex. 2 at 16, ¶ 20.

[3] *Delawareans for Ed. Opportunity v. Carney*, 2018 WL 4849935 (Del. Ch. 2018) ("*DEO I*"); *Delawareans for Ed. Opportunity v. Carney*, 199 A.3d 109 (Del. Ch. 2018) ("*DEO II*"); *In re Del. Pub. Schs. Litig.*, 239 A.3d 451 (Del. Ch. 2020) ("*DEO III*"); *In re Del. Pub. Schs. Litig.*, 2022 WL 1220075 (Del. Ch. 2022); *In re Del. Pub. Schs. Litig.*, 277 A.3d 296, 2022 WL 1552592 (Del. 2022) (TABLE).

[4] A129 (Verified Complaint) (Jan. 16, 2018) (naming the following officials as defendants: John Carney, Governor of the State of Delaware; Susan Bunting, Secretary of Education of the State of Delaware; Kenneth A. Simpler, Treasurer of the State of Delaware; Susan Durham, Director of Finance of Kent County, Delaware; Brian Maxwell, Chief Financial Officer of New Castle County, Delaware; and Gina Jennings, Finance Director for Sussex County, Delaware).

## I. RELEVANT FACTUAL AND PROCEDURAL BACKGROUND[5]

### A. The Parties

Defendants Below-Appellants are several Delaware officials, including the Director of Finance of Kent County, the Chief Financial Officer of New Castle County, and the Finance Director of Sussex County (collectively, the "County Defendants").[6] Plaintiffs Below-Appellees are two organizations: Delawareans for Educational Opportunity ("DEO") and the NAACP Delaware State Conference of Branches ("NAACP-DE").[7] Both organizations are "non-profit, non-partisan, civic-oriented institutions with a strong interest in Delaware's schools."[8] DEO's membership includes the parents of students from low-income households, English language learners, children with disabilities, and other

---

[5] The facts, except as otherwise noted, are taken from the Court of Chancery's post-trial March 28, 2022 order holding that Appellees are entitled to attorneys' fees [hereinafter "Entitlement Order"]; and its March 29, 2023 order determining the reasonable amount of attorneys' fees [hereinafter "Fees Order"]. *See* Opening Br., Exs. 1, 2.

[6] Opening Br. at 2.

[7] Plaintiffs describe DEO and NAACP-DE as follows:

> [DEO] is a nonprofit association of Delawareans concerned about the state's failure to provide all children with an adequate education. They have joined together for the purpose of improving the Delaware education system so that all children have a meaningful opportunity to obtain an adequate education regardless of where they live, their economic circumstances, their health, their disability status or their first language.

> [NAACP-DE] is a non-partisan organization affiliated with the National Association for the Advancement of Colored People. NAACP-DE has seven branches located throughout the state. NAACP-DE's mission is to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination.

B042–B043 (Verified Amended Complaint, ¶8, ¶10 (Dec. 26, 2018)) [hereinafter "Amended Complaint"].

[8] Entitlement Order at 1, ¶ 1 (internal citation omitted).

students attending high poverty schools who have "suffered harm because of the failures of Delaware's public schools" to meet their needs.[9] NAACP-DE's membership includes "parents of children enrolled in public schools in Delaware who suffer harm because of the deficiencies" resulting from Delaware's alleged failure to provide those disadvantaged students with an adequate education.[10] NAACP-DE's mission is to ensure the political, educational, social, and economic equality of rights of all persons and to eliminate race-based discrimination. Appellees were represented by lawyers from the American Civil Liberties Union Foundation of Delaware (the "ACLU"), the Delaware Community Legal Aid Society, Inc. ("CLASI"), and Arnold & Porter Kaye Scholer LLP ("Arnold & Porter") (together, "Appellees' Counsel").[11]

B. *The Delaware Public Schools Litigation*

In January 2018, Appellees filed suit against the defendants because they believed that Delaware public schools were not providing an adequate education to disadvantaged students.[12] Appellees pointed to a broken system for funding public schools as one of the reasons why Delaware's public schools have fallen short. In Delaware, approximately one third of funding for public schools is derived from local taxes levied by individual school districts. When school districts in Delaware levy local taxes, they use the county

---

[9] *DEO III*, 239 A.3d at 525.

[10] A134 (Verified Complaint) (Jan. 16, 2018).

[11] Fees Order at 1, ¶ 1; Motion for Admission *Pro Hac Vice* of Peta Gordon (Apr. 1, 2019) (Appellees' original counsel in 2018 was the ACLU and CLASI; Arnold & Porter joined the litigation in 2019).

[12] A129 (Verified Complaint) (Jan. 16, 2018).

4

assessment rolls prepared by New Castle County, Kent County, and Sussex County. If there are deficiencies or problems with the counties' tax assessment rolls, those deficiencies or problems will affect the school districts' ability to levy taxes. Appellees sought to prove that the "counties contributed to the problems facing Delaware's schools by failing to [assess and] collect school-related taxes in a manner that complied with the applicable constitutional and statutory requirements."[13]

In response to the January 2018 complaint, all of the defendants moved to dismiss, but the Court of Chancery denied the motions.[14] After resolving the pleading-stage motions, the Court of Chancery bifurcated the litigation into a "County Track" (which handled the claims against the County Defendants) and a "State Track" (which handled the claims against state officials).[15] In February 2019, the Court of Chancery further bifurcated the County Track litigation into two phases — the merits phase and the remedial phase.

---

[13] Entitlement Order at 1, ¶2. Appellees' original complaint asserted three claims. Counts I and II alleged that the state defendants violated Section 1 of Article X of the Delaware Constitution which requires that the "General Assembly shall provide for the establishment and maintenance of a general and efficient system of free public schools[.]" Del. Const. art. X, § 1. Count III alleged that the County Defendants violated Delaware's True Value Statute, 9 *Del. C.* § 8306(a), which requires that all property subject to an assessment shall be assessed at its true value in money — *i.e.*, its fair market value.

[14] The court issued one decision denying the County Defendants' motion. *See DEO I*, 2018 WL 4849935, at *1 (addressing only Count III of Appellees' complaint, which concerned the County Defendants' alleged violations of Delaware's True Value Statute). The court issued a separate decision denying the state officials' motion. *See DEO II*, 199 A.3d 109 (addressing Counts I and II of Appellees' complaint, which concerned the state defendants' alleged violations of Section 1 of Article X of the Delaware Constitution).

[15] Entitlement Order at 2, ¶ 4. After the bifurcation, Appellees filed an Amended Complaint in December 2018 which added Count IV alleging that the outdated property assessments violated the Delaware Constitution's Uniformity Clause, Del. Const. art. VIII, § 1, which requires all taxpayers within the same general class to be treated equally. *See* Amended Complaint, ¶ 194–¶ 197 (Dec. 26, 2018).

The court held a trial on the merits phase in the County Track litigation on July 17 and 18, 2019. After post-trial briefing and argument, the court issued its opinion on May 8, 2020.[16] In its 116-page opinion, the Court of Chancery held that all three counties used methodologies in preparing their property assessments that violated Delaware's "True Value Statute"[17] and the Delaware Constitution's "Uniformity Clause."[18]

Following this ruling, the litigation proceeded to the remedial phrase. During this phase, the parties reached a settlement with each of the counties, pursuant to which each county agreed to conduct a general tax reassessment. Shortly thereafter, on May 10, 2021, Appellees moved for an award of attorneys' fees and expenses.

## C. Proceedings in the Court of Chancery

The present appeal arises from the trial court's ruling on Appellees' May 10, 2021 fee application. After briefing and argument by the parties, the Court of Chancery published two separate orders in March of 2022 and March of 2023. The first order, the Entitlement Order, determined that Appellees were entitled to an award of attorneys' fees and expenses and the second order, the Fees Order, addressed the amount of fees County Defendants were required to pay.

### 1. The March 2022 Entitlement Order

In the Entitlement Order, the trial court recognized that, under the traditional

---

[16] *See DEO III*, 239 A.3d at 451.

[17] 9 *Del. C.* § 8306(a) (requiring property be assessed for tax purposes at its true value in money).

[18] Del. Const. art. VIII, § 1 ("All taxes shall be uniform upon the same class of subjects within the territorial limits of the authority levying the tax, except as otherwise permitted herein, and shall be levied and collected under general laws passed by the General Assembly.").

American Rule, litigants are generally responsible for paying their own legal fees absent certain limited exceptions.[19]  The court identified one circumstance that allowed it to shift attorneys' fees as a matter of equity — "when the litigation creates a common benefit."[20]  The trial court acknowledged that the common benefit doctrine applies most frequently in the context of corporate litigation, but it noted that Delaware courts have applied the doctrine in other limited contexts involving certain creditor suits and certain suits brought by trustees or executors of estates.  In determining whether the common benefit doctrine applied under the facts presented, it addressed the "threshold question" of whether "the litigation conferred a benefit on others."[21]  Two important decisions from this Court — *Dover Historical Society* (hereinafter, *"Dover"*)[22] and *Korn v. New Castle County* (hereinafter, "*Korn*") [23] — lie at the heart of Appellants' challenges to the court's analysis

---

[19] Entitlement Order at 3, ¶ 8 (quoting *Scion Breckinridge Managing Member, LLC v. ASB Allegiance Real Est. Fund*, 68 A.3d 665, 686 (Del. 2013) ("[L]itigants in Delaware are generally responsible for paying their own counsel fees, absent special circumstances or a contractual or statutory right to receive fees.") (internal quotation marks and citation omitted)).

[20] *Id.* (observing that "'[t]he benefit may take the form of either a tangible, monetary benefit (*i.e.*, the 'common fund' exception), or an intangible benefit to an entity, such as supplemental disclosures or changes in corporate governance (*i.e.*, the 'corporate benefit' exception).'" (quoting *Judy v. Preferred Commc'n Sys., Inc.*, 2016 WL 4992687, at *14 (Del. Ch. 2016))).

[21] *Id.* 4, ¶ 9.

[22] *Dover Hist. Soc'y, Inc. v. City of Dover Plan. Comm'n*, 902 A.2d 1084 (Del. 2006).

[23] *Korn v. New Castle Cnty.*, 922 A.2d 409 (Del. 2007).  *See also Korn v. New Castle Cnty.*, 2005 WL 396341 (Del. Ch. 2005) (granting taxpayer-plaintiffs' request for declaratory judgment that the county's creation of "reserve funds" from a budgetary surplus violated statutory requirements; the court declined to enjoin the county's planned bond sale because the county voluntarily postponed it); *Korn v. New Castle Cnty.*, 2005 WL 2266590 (Del. Ch. 2005) (granting summary judgment in favor of the county-defendant regarding taxpayer-plaintiffs' amended complaint; the court also held that each party must bear its own costs and attorneys' fees); *Korn v. New Castle Cnty.*, 2006 WL 588041 (Del. Ch. 2006) (denying taxpayer-plaintiffs' motion for re-argument concerning the trial court's order that directed each party to bear its own costs and attorneys' fees

and application of the common benefit doctrine.

By way of brief background, in *Dover*, this Court rejected fee-shifting in a non-taxpayer, public interest suit that ultimately caused a government entity to "perform properly."[24] There we held that the social benefit resulting from compelling a government entity to perform properly did not, by itself, justify creating a new exception to the American Rule. In so holding, this Court rejected the private attorney general exception to the American Rule — an equitable exception that is followed by some states and which we address later in more detail.[25] Unlike *Dover*, *Korn*, decided a year later, was a taxpayer suit. In *Korn*, fees were awarded under the "common benefit exception"[26] to the American Rule because the plaintiffs created for all taxpayers a tangible benefit that was both "substantial" and "quantifiable."[27]

In construing these cases, the trial court determined that the County Track litigation benefitted taxpayers and that the County Defendants were construing *Korn* too narrowly in contending that it only applied outside the corporate context to taxpayer suits. In holding

---

in this action) [for the sake of convenience, we refer to our Court's holding discussed herein, 922 A.2d 409, as "*Korn*"].

[24] *Dover*, 902 A.2d at 1091.

[25] *Id.* (explaining that the case was not unlike one where "a citizen sues successfully on behalf of the public interest as a private attorney general, and then seeks reimbursement of his or her attorneys' fees for having successfully caused a government agency . . . to do its job properly.").

[26] *Korn*, 922 A.2d at 409. We note the distinction we made in *Dover* that when referring to non-monetary benefits, we preferred the term "corporate benefit" as opposed to the "common benefit." *Dover*, 902 A.3d at 1090, n.11. We used "common fund" to refer to the related exception which involves the creation of a monetary benefit upon an ascertainable class of individuals. *See infra* at 17–18.

[27] *Korn*, 922 A.2d at 413.

that *Korn* applies more broadly to public interest lawsuits, the court reasoned that the power to award fees for conferring a common benefit "'is a flexible one based on the historic power of the Court of Chancery to do equity in particular situations.'"[28] As a matter of public policy, the court emphasized the importance of providing an incentive for litigants to take on difficult statutory and constitutional issues such as those presented in the County Track litigation.[29] Additionally, the trial court observed that Appellees were "courageous" for litigating this case as it was not "reasonably likely that anyone except groups like the plaintiffs would be able to mount a meaningful challenge."[30] The court concluded that it was "both equitable and desirable to apply the common benefit doctrine on the facts of this case[,]"[31] and that this was "the type of socially beneficial litigation that should be rewarded."[32] Thus, the only question it had to answer was whether Appellees had met the

---

[28] Entitlement Order at 5–6, ¶ 12 (quoting *Tandycrafts, Inc. v. Initio Partners*, 562 A.2d 1162, 1166 (Del. 1989)) (adding that "[t]he core rationale underlying the common benefit doctrine is to incentivize parties to bring meritorious litigation that either (i) confers a benefit on the defendant or (ii) results in a broader class of parties receiving a benefit under the circumstances where it is equitable to require the defendant to bear the cost of conferring the benefit.").

[29] The trial court observed:

> Delaware's system of property tax assessment had become irretrievably broken. It has been decades since the counties conducted their last general assessments, and Delaware policymakers have long recognized that the counties' failure to update their assessments undermined Delaware's system for funding public schools. Yet in the intervening decades, no one stepped forward to fix the system. The counties had not taken action, and the political branches had not stepped in. Absent a legal challenge, Delaware's inequitable system of property tax assessment would have persisted.

*Id.* at 6–7, ¶ 13.

[30] *Id.* at 7, ¶ 14.

[31] *Id.* at 8, ¶ 16.

[32] *Id*. at 8, ¶ 15.

following requirements for that exception: (i) the action was meritorious when filed; (ii) an ascertainable group received a substantial benefit; and (iii) a causal connection existed between the litigation and the benefit.[33]

The trial court determined that the common benefit doctrine applied because, first, the claim was meritorious when filed as evidenced by the court's denial of Appellants' motion to dismiss. Second, it concluded that ascertainable groups would receive substantial benefits. Specifically, the trial court identified the local school districts and the vocational-technical districts as beneficiaries of the litigation. The substantial benefits of the litigation were: the optionality of a 10% increase in school funding when the reassessments are completed in the coming years;[34] the expectation that updated reassessments would make it easier for the school districts to keep their assessments current in the future; that increases in the tax base would mitigate the need for school districts to call referenda every three to five years to keep pace with inflation; and that the reassessments would reestablish "vertical equity" in a "regressive" tax system in which certain taxpayers were not previously paying their fair share of taxes. Third, the lawsuit was the sole cause of these benefits: "the counties have made clear that absent a determination by the Delaware courts, they intend to continue violating the law . . . [t]he counties only committed to conduct a general assessment after the court ruled against them

---

[33] *Id*. at 8, ¶ 17 (citing *Dover*, 902 A.2d at 1089).

[34] *Id*. at 8–9, ¶ 19; *see also In re Del. Pub. Schs. Litig.*, 2022 WL 1220075, at *13 ("Increased optionality [to increase school funding in the future] is a benefit . . . [m]oreover 'it is highly likely that school districts will happily accept the 10% increase in revenue that would result from a general reassessment[.]'") (quoting *DEO III*, 239 A.2d at 532)).

10

on the merits and after the parties had spent months conducting remedial discovery."[35]

Finally, the trial court rejected the County Defendants' argument that the counties should not be compelled to pay the award because they will not receive any benefits themselves. In rejecting this "identity of interest" argument, the trial court determined that the counties will in fact benefit since they will be in compliance with the law, which "is a benefit to that organization, be it a corporation or a county."[36] Additionally, the counties will benefit from a more equitable tax system and from improved educational opportunities for county residents. The trial court also observed that, even if the counties were not beneficiaries of the lawsuit, it would be equitable to make them pay the award because they are "best positioned to compensate the plaintiffs on behalf of the parties that benefitted."[37] The trial court did not address the question of a reasonable amount of fees and expenses — which it would later separately determine in the Fees Order.

### 2. *Appellants' Interlocutory Appeal*

Following the trial court's Entitlement Order, Appellants submitted an interlocutory

---

[35] *Id.* at 10, ¶ 22 (internal quotation marks and citation omitted).

[36] *Id.* at 10–11, ¶ 23 (citing *Chicago Milwaukee Corp. v. Eisenberg*, 560 A.2d 489, 1989 WL 27743, at *1 (Del. 1989) (TABLE) ("it is well established under Delaware law that when a transaction is corrected to comply with Delaware law, the corporation and all of its shareholders receive a benefit.")). *See also Korn*, 922 A.2d at 413 (explaining that a social benefit "invariably results when a government agency is required to do its job.").

[37] *Id.* at 11, ¶ 24 (comparing this situation to the corporate realm where Delaware courts may require a corporation to pay a fee award for a benefit conferred on its stockholders because the corporation is "optimally positioned to compensate the plaintiffs on the stockholders' behalf. Through ownership interest in the corporation, the stockholders indirectly bear the cost [of] funding the award.") (citing *In re First Interstate Bancorp Consol. S'holder Litig.*, 756 A.2d 353, 362 (Del. Ch. 1999), *aff'd sub nom. First Interstate Bancorp v. Williamson*, 755 A.2d 388, 2000 WL 949652 (Del. 2000) (TABLE); *Richman v. DeVal Aerodynamics, Inc.*, 185 A.2d 884, 886 (Del. Ch. 1962))).

appeal to this Court on April 26, 2022. Appellants urged this Court to accept the appeal

for the following reasons:

> (i) the Entitlement Order involves a question of law resolved for the first time (factor A) because it creates a new exception to the American Rule; (ii) the Entitlement Order conflicts with Court of Chancery precedent (factor B); and (iii) interlocutory review of the Entitlement Order would serve the interests of justice (factor H) because the County Defendants may avoid expending resources that they allege are necessary to challenge the reasonableness of the proposed fee award and to conduct discovery into whether any school or vocational district will, in fact, raise taxes after the reassessments.[38]

This Court refused the appeal because the circumstances did not meet the strict standards

for certification under Delaware Supreme Court Rule 42(b).

### 3. The March 2023 Fees Order

The trial court's second order filed March 29, 2023 — the Fees Order — determined

the amount of attorneys' fees and expenses. Following its detailed analysis, the trial court

held that the award of fees of $1,476,001.88 was reasonable. Additionally, it awarded

Appellees' Counsel an uncontested sum of $73,470.02 in expenses, bringing the total of

attorneys' fees and expenses to $1,549,471.90.[39]

### D. Contentions on Appeal

Appellants challenge both orders on appeal. They argue that the Entitlement Order

improperly applied the common benefit doctrine, and that it failed to comport with the

limitations on fee shifting established by our Court's decisions in *Dover* and *Korn*.

---

[38] *In re Del. Pub. Schs. Litig.*, 277 A.3d 296, 2022 WL 1552592, at *1 (Del. 2022) (TABLE).

[39] At oral argument, Appellants confirmed that they were challenging only the award of attorneys' fees and not the award of expenses. *See* Oral Argument, at 4:15–30, vimeo.com/884856008.

Appellants base their argument for reversal on four grounds: (i) the trial court ignored this Court's holding in *Dover* and awarded fees to Appellees for compelling the government to "perform properly;" (ii) the trial court inappropriately relied on *Korn*, which only expanded the common benefit doctrine to taxpayer suits, and this matter is not a taxpayer suit; (iii) the trial court took an unwarranted and unprecedented step by requiring Appellants to pay fees for benefitting parties with whom Appellants have no identity of interest; and (iv) the trial court adopted, "in all but name only," the "private attorney general" exception to the American Rule, which was rejected by this Court in *Dover*.[40]

Appellees seek affirmance of the orders for three reasons. First, they argue that the orders did not contravene *Dover* or *Korn*:

> The fee award does not contravene [*Dover*] and [*Korn*] for three independent reasons. First, this action resulted in many benefits besides causing the government to perform properly. Second, the rationale of *Korn* is not limited to public interest suits that can be characterized as taxpayer suits. Third, this action is a taxpayer suit. The complaint requested declaratory and injunctive [relief] to end Defendants' use of public money to collect taxes in contravention of the Uniformity Clause and the True Value Statute.[41]

Second, Appellees maintain that the Court of Chancery carefully considered the facts and applied precedent when it awarded attorneys' fees and expenses. They argue there was, in fact, an identity of interest between the County Defendants and the alleged beneficiaries of the litigation for the following reasons:

> [1] non-speculative benefits of the litigation inured to the counties, [2] neither the school districts and students in the counties nor the property owners who pay taxes to the counties are unrelated to the Defendants or the

---

[40] Opening Br. at 1–2.

[41] Answering Br. at 4.

counties, and [3] the counties are positioned to require that their taxpayers, including individuals who will receive a benefit from Plaintiffs' litigative efforts, share the costs of the litigation if they so choose.[42]

Third, Appellees argue that fee shifting is permissible under *Dover* when a "litigation's benefits include more than the social good that comes from making the government do its job properly."[43] Accordingly, they disagree that the trial court implicitly applied the private attorney general exception to the American Rule.

In addition to the parties, the Delaware League of Local Governments (the "DLLG") has filed an amicus brief in support of reversing the Court of Chancery's decision. The DLLG argues that the Court of Chancery failed to adequately address this Court's decision in *Dover* and that it "improperly created a newfound common law exception to the American Rule by allowing fee shifting . . . for 'public benefit' litigation."[44] According to the DLLG, a mere social benefit does not justify an exception to the American Rule and it is up to the legislature, not the courts, to determine whether fee shifting is appropriate in public interest litigation.

The DLLG also contends that *Korn* only slightly expanded the common benefit doctrine beyond the corporate context to include taxpayer suits. They contend that because this case is not a taxpayer suit, the doctrine does not apply.[45] Their position is that fee

---

[42] *Id.*

[43] *Id.* at 5.

[44] Amicus Br. at 11 (arguing that this Court's precedent in *Dover* is clear — fee shifting under the common benefit doctrine is not permitted in suits where plaintiffs succeeded only in requiring the government to "do its job" and "perform properly.").

[45] *Id.* at 13–14 (noting that taxpayer suits are a specific class of lawsuits: "[t]axpayer suits are limited to those situations where a taxpayer challenges how public funds are spent, or the manner

14

shifting is permitted under the common benefit doctrine outside the corporate context only in taxpayer suits and then, if and only if, the plaintiff achieves a substantial and quantifiable monetary benefit for all taxpayers.[46] They warn of the real-world problems if this Court does not reverse the trial court's expansive interpretation of the common benefit doctrine:

> Such a result would: (1) encourage mercenary plaintiffs who would seek to parlay a perceived error or mistake by the government into a large fee award; (2) provide a disincentive for the municipality or governmental body to vindicate what it believes is the correct formulation of the law for fear that, if they are wrong, they will be hit with a large financial damage award for the opposing party's attorneys; (3) result in potentially large awards for any type of litigation which could cripple and curtail vital municipal and governmental services — especially in smaller municipalities; and (4) eviscerate the American Rule for actions against government entities because any action deemed to be in the public interest that compelled the government to change course could be deemed a common benefit.[47]

In sum, the DLLG urges reversal because the Entitlement Order, with its expansion of the common benefit doctrine, contravenes *Dover*; improperly extends *Korn* to non-taxpayer suits; and creates real-world problems.

---

in which public lands are used. Where a citizen files suit to compel government action in compliance with statutory provisions — as was the case herein — taxpayer suit status does not follow.") (internal citations omitted)). *See also Reeder v. Wagner*, 974 A.2d 858, 2009 WL 1525945, at *2 (Del. 2009) (TABLE) ("Taxpayer standing in Delaware is 'reserved for a narrow set of claims involving challenges either to expenditure of public funds or use of public lands.'") (quoting *O'Neill v. Town of Middletown*, 2006 WL 205071, at *19 (Del. Ch. 2006))).

[46] Amicus Br. at 15.

[47] *Id.* at 4–5; *see also id.* at 1–2 (listing the numerous types of "public interest" lawsuits that could be brought against government entities:  challenges to rezonings and subdivision approvals; challenges to allocations of funds through the community transportation fund; challenges to the validity of ordinances; challenges to persons being elected to office; assessment cases; school funding cases; medical insurance coverage challenges; citizen attempts to enforce town zoning ordinances; writs of mandamus; actions to produce President Biden's senatorial papers; pension plan challenges; election law challenges; challenges to Covid-19 related restrictions; *etc.*).

## II.    STANDARD OF REVIEW

To the extent the challenged award of fees "requires the formulation of legal principles . . . that formulation is subject to *de novo* review."[48]

## III.    ANALYSIS

### A. Overview of Relevant Delaware Precedent Concerning Fee Awards

#### 1. The American Rule

Delaware follows the "American Rule" in awarding attorneys' fees, which provides that "'a litigant must, himself, defray the cost of being represented by counsel.'"[49]  This longstanding practice originated with the United States Supreme Court's 1796 decision in *Arcambel v. Wiseman*,[50] where the inclusion of attorneys' fees as damages was overturned. The Court reversed the fee award because "[t]he general practice of the United States is in opposition to [awarding fees]" and that practice "is entitled to the respect of the court, till it is changed, or modified, by statute."[51]  Delaware, likewise, historically and consistently has applied the American Rule when considering awards of attorneys' fees.[52]

---

[48] *Gannett Co., Inc. v. Bd. of Managers of the Del. Crim. Just. Info. Sys.*, 840 A.2d 1232, 1240 (Del. 2003) (internal citation omitted).

[49] *Dover*, 902 A.2d at 1089 (quoting *Chrysler Corp. v. Dann*, 223 A.2d 384, 386 (Del. 1966)).  *See also William Penn P'ship v. Saliba*, 13 A.3d 749, 758 (Del. 2011) ("Generally, under what is commonly known as the American Rule, 'absent express statutory provisions to the contrary, each party involved in litigation will bear only their individual attorneys' fees no matter what the outcome of the litigation.'") (quoting *Cantor Fitzgerald, L.P. v. Cantor*, 2001 WL 536911, at *4 (Del. Ch. 2001))).

[50] *Arcambel v. Wiseman*, 3 U.S. 306, 1796 WL 896, at *1 (1796).

[51] *Id.*

[52] *See, e.g.*, *Kaung v. Cole Nat'l Corp.*, 884 A.2d 500, 506 (Del. 2005) ("It is a general rule that courts in the United States do not award attorney's fees to prevailing parties in litigation.  This practice, commonly referred to as the 'American Rule,' is followed by the Delaware Courts.")

Aside from express statutory authorization, Delaware recognizes only a limited number of exceptions to the American Rule. For example, fees may be shifted if: (i) recovery of fees is provided by statute or court rule; (ii) there is a contractual provision regarding entitlement to attorneys' fees; (iii) a party has acted in bad faith in connection with the conduct of the litigation process; (iv) a party fails to abide by a court order or is held in contempt; and (v) the action results in the creation, protection or distribution of a common fund or confers a corporate benefit.[53] In describing the common benefit doctrine, this Court in *Dover* described two related exceptions falling within that doctrine:

> The "common fund" exception enables a litigant who succeeds in conferring

---

(internal citations omitted); *Johnston v. Arbitrium (Cayman Islands) Handels AG*, 720 A.2d 542, 545 (Del. 1998) ("Under the American Rule, absent express statutory language to the contrary, each party is normally obliged to pay only his or her own attorneys' fees, whatever the outcome of the litigation.") (internal citation omitted); *Petition of State*, 708 A.2d 983, 989 (Del. 1998) ("under the American Rule governing the award of attorney's fees, a court of law will not award attorney's fees unless a statute, contract or procedural rule makes the award explicit.") (internal citation omitted); *Goodrich v. E.F. Hutton Grp., Inc.*, 681 A.2d 1039, 1043–44 (Del. 1996) ("The standards for awarding attorney's fees in litigation by the Court of Chancery are well-established . . . . The starting principle is a recognition of the so-called 'American Rule[]' . . . . Pursuant to the American Rule, prevailing litigants are responsible for the payment of their own attorney's fees[.]") (internal citations omitted); *In re Equitable Tr. Co.*, 30 A.2d 271, 272 (Del. Ch. 1943) ("The general and well-recognized rule, subject to but few exceptions, is that a litigant must himself defray the costs of representation by counsel.").

[53] *See* Donald J. Wolfe, Jr. & Michael A. Pittenger, *Corporate and Commercial Practice in the Delaware Court of Chancery*, § 17.03 [a]-[f] (2d ed. 2023); *see also Arbitrium*, 705 A.2d at 231 (observing that courts do not deviate from the American Rule absent special circumstances which "are limited to: 1) cases where fees are authorized by statute, 2) cases where the applicant creates a common fund or non-monetary benefit for the benefit of others, 3) cases where the underlying (pre-litigation) conduct of the losing party was so egregious as to justify an award of attorneys' fees as an element of damages, and 4) cases where the court finds that the litigation was brought in bad faith or that a party's bad faith conduct increased the costs of litigation[,]"; *Dover*, 902 A.2d at 1090 (observing that express statutory authorization and certain equitable doctrines provide limited exceptions to the American Rule); *Gatz Properties, LLC v. Auriga Cap. Corp.*, 59 A.3d 1206, 1222 (Del. 2012) ("Although this case involved a legal dispute over a contractual provision of an LLC Agreement, even at law a court has inherent authority to shift fees where necessary to control the court's own process.") (internal citation omitted)).

a monetary benefit upon an ascertainable class of individuals to recover costs from the fund that he or she has created. A somewhat related exception, the "corporate benefit" doctrine, allows a litigant to recover fees and expenses from a corporation where the litigation has conferred some other (non-monetary) valuable benefit upon the corporate enterprise or its shareholders.[54]

The Vice Chancellor similarly observed here that in circumstances where "the litigation creates a common benefit," the "'benefit may take the form of either a tangible, monetary benefit (*i.e.*, the 'common fund' exception), or an intangible benefit to an entity, such as supplemental disclosures or changes in corporate governance (*i.e.*, the 'corporate benefit' exception).'"[55]

Another exception to the American Rule — the private attorney general exception

---

[54] *Dover*, 902 A.2d at 1090 (internal citations omitted). Our Court in *Dover* observed that the "appellants characterize the doctrine as the 'common benefit' doctrine, but our case law largely refers to it as the 'corporate benefit' doctrine." *Id.*, n.11. In *Dover*, the common fund doctrine was not relevant "because no fund was created as a result of the litigation." *Id.*

[55] Entitlement Order at 3, ¶ 8 (quoting *Judy*, 2016 WL 4992687, at *14 and *Dover*, 902 A.2d at 1090). Typically, the common fund exception is applied in stockholder class actions and derivative suits. *See, e.g., Ams. Mining Corp. v. Theriault*, 51 A.3d 1213, 1253 (Del. 2012) (observing that "'[t]ypically, successful derivative or class action suits which result in the recovery of money or property wrongfully diverted from the corporation . . . are viewed as fund creating actions.'") (internal citation omitted)). In addition to taxpayer suits, the common fund exception has been applied in suits involving creditors' bills resulting in recovery of money and in proceedings initiated by a trustee or executor seeking instructions for the proper administration of a trust, estate, or receivership. *See* Wolfe & Pittenger, § 17.03 [f][2], 17-27–28. *See Bankers Tr. Co. v. Duffy*, 295 A.2d 725, 726 (Del. 1972) (observing that "[t]he general law provides two situations in which an allowance from a trust corpus for attorneys' fees may be made: when the attorneys' services were necessary for the proper administration of the trust . . . or where the services otherwise resulted in a benefit to the trust[.]"); *Maurer v. Int'l Re-Insurance Corp.*, 95 A.2d 827, 830 (Del. 1953) (the common benefit doctrine has been applied where "[s]uccessful minority stockholders' suits and creditors' bills," resulted in "the recovery of money or property or the establishment of a lien[.]"); *id.* (noting that the common benefit doctrine has been applied where a proceeding instituted by a trustee or executor seeks instructions for the proper administration of the trust or estate); *id.* at 831 (observing that "[i]n cases of this sort, whether involving trusts, estates, or receiverships, equity awards counsel fees as part of the necessary costs and expenses of administering the fund.").

— is recognized in some jurisdictions,[56] but is not followed by Delaware or federal courts.[57] The private attorney general exception applies "where a citizen sues successfully on behalf of the public interest as a private attorney general, and then seeks reimbursement of his or her attorneys' fees for having successfully caused a government agency . . . to do its job properly."[58] Appellants contend that the trial court, in essence, applied this exception in contravention of this Court's express rejection of it in *Dover*.

We move to the parties' main focus in this appeal — whether the fee award can be justified under our holdings in *Dover* and *Korn*.

### 2. *Dover Historical Society*

In *Dover*, developers sought and obtained approval from the Dover Planning Commission ("DPC") to construct a new three-story office building in the Dover Green

---

[56] *See, e.g., Ansley v. Banner Health Network*, 459 P.3d 55, 65 (Ariz. 2020); *Serrano v. Priest*, 569 P.2d 1303, 1314 (Cal. 1977) ("if a trial court . . . determines that the litigation has resulted in the vindication of a strong or societally important public policy, that the necessary costs of securing this result transcend the individual plaintiff's pecuniary interest to an extent requiring subsidization, and that a substantial number of persons stand to benefit from the decision, the court may exercise its equitable powers to award attorney fees on this theory."); *Hellar v. Cenarrusa*, 682 P.2d 524, 531 (Idaho 1984) (awarding fees pursuant to the private attorney general doctrine following plaintiffs' successful challenge to the constitutionality of a reapportionment statute); *Montanans for Responsible Use of Sch. Tr. v. State ex rel. Bd. of Land Comm'rs*, 989 P.2d 800, 812 (Mont. 1999) ("We adopt the private attorney general theory . . . .").

[57] *See, e.g.*, *Polonski v. Trump Taj Mahal Assocs.*, 137 F.3d 139, 147 (3d Cir. 1998) ("the narrowly tailored common benefit exception might provide an impermissible back door to the 'private attorney general' framework that was rejected in *Alyeska Pipeline*.") (citing *Alyeska Pipeline Serv. Co. v. Wilderness Soc'y*, 421 U.S. 240 (1975))); *Dover*, 902 A.2d at 1091.

[58] *Dover*, 902 A.2d at 1091. *See also Serrano*, 569 P.2d at 1312 (explaining that the private attorney general exception "seeks to encourage suits effectuating a strong congressional or national policy by awarding substantial attorney's fees, regardless of defendants' conduct, to those who successfully bring such suits and thereby bring about benefits to a broad class of citizens.") (internal quotation marks and citation omitted).

Historic District. The developers also received an architectural review certificate and a recommendation for such approval from the Historic District Commission ("HDC") as the project would require the demolition of several historic buildings. Following the HDC's recommendation, the DPC approved the issuance of the certificate. The appellants, which included Dover Historical Society, Inc., filed suit to prevent the destruction of the historic buildings. After this Court reversed the Superior Court's dismissal of the case for lack of standing, the Superior Court, on remand, held that the DPC had exceeded its jurisdiction because it failed to adhere to the *Design Guidelines and Standards* (the "Guidelines") provisions of the Dover Code, which governed new construction within the Dover Historic District. Thereafter, the DPC reconsidered the proposal using the Guidelines and re-approved the plan. The appellants sought attorneys' fees under what they referred to as the "common benefit exception" to the American Rule. The Superior Court denied the application.[59]

After the appellants filed a petition for review of the DPC's second approval, a principal of the appellee, in a fit of frustration, demolished three of the four historic structures with a trac hoe.[60] In response, the City of Dover revoked the architectural review certificate that the DPC had granted to the appellees. The appellants then filed a second application for attorneys' fees under the bad faith exception to the American Rule. The

---

[59] *Id.* at 1089. The Superior Court held that the action did "not fall within any recognizable exception to the American rule[.]" *Dover Hist. Soc'y v. City of Dover Plan. Comm'n*, 2005 WL 1950795, at *4 (Del. Super. 2005). The Superior Court also ordered the appellants to file a new petition if they sought to challenge the second DPC approval.

[60] *Dover*, 902 A.2d at 1089 (a trac hoe is a piece of construction equipment).

20

application was again denied by the Superior Court. The denial of both applications formed the basis of the consolidated appeal to this Court.

On appeal, the appellants argued that the fee award should have been granted because it fell under the "common benefit" and bad faith exceptions to the American Rule. The appellees responded that the "common benefit" exception was limited to the corporate litigation context, and if expanded further, it should apply only to cases brought in equity. Our Court held that the facts of this case did not merit an application of the corporate benefit exception, observing that "[t]he corporate benefit exception to the American Rule is typically applied in business enterprise litigation."[61] We explained our reluctance to broaden the exception:

> In essence, this case is not unlike one where a citizen sues successfully on behalf of the public interest as a private attorney general, and then seeks reimbursement of his or her attorneys' fees for having successfully caused a government agency (here, the DPC) to do its job properly. In the public interest litigation context, absent legislative authorization, fee-shifting applications are disfavored. Historically, our courts have been cautious about creating and expanding judge-made exceptions to the American Rule absent express and clear legislative guidance. Here, to the extent this lawsuit caused the DPC to perform properly, it clearly created a social benefit. But, that benefit is not of the kind that justifies creating a new *judge*-made exception to the American Rule.[62]

Although this Court acknowledged the public benefit caused by compelling the DPC to "perform properly," it held that this benefit alone did not warrant the creation of a judge-

---

[61] *Id*. at 1091.

[62] *Id.* (internal citations omitted) (emphasis in original); *see also id*. ("The appellants have not cited to us, nor have we found, any case where the common fund or corporate benefit exception was applied in a building construction context.").

made exception to the American Rule. Accordingly, we held that the Superior Court had correctly denied the appellants' first fee application. But we reversed the court's rejection of the second fee application under the bad faith exception due to the improper demolition of the buildings. With this foundation, we move to the second key Delaware precedent at the center of this dispute, namely, *Korn*. The parties join issue over whether our holding in *Korn* extends beyond taxpayer suits.

### 3. *Korn*

In *Korn*, the appellants filed suit in the Court of Chancery seeking a declaratory judgment that New Castle County's creation of twelve reserve accounts holding over $200 million in surplus revenues violated several statutory requirements.[63] The complaint requested that a pending $80 million bond sale be stayed until the validity of the reserves could be determined by the court. The trial court granted the appellants' motion for summary judgment as to the unlawfulness of the reserves and held that the diversion of the surplus revenues into the reserve accounts violated a provision of the Delaware Code requiring that available surpluses be used to balance the budget. The bond sale was not enjoined because the county voluntarily stayed the bond issuance. Thereafter, the county created two new reserve accounts that retroactively appropriated the funds in the invalid reserves to the new reserve accounts. After an audit report disclosed the existence of a $650,000 surplus in the County's Light Tax Fund, Korn supplemented his complaint with a challenge to the Light Tax Fund surplus.

---

[63] Appellants were Richard J. Korn and Andrew Dal Nogare (collectively, "Korn").

Thereafter, the Court of Chancery granted the County's motions for summary judgment as to all claims and dismissed Korn's amended complaint with prejudice. The court noted that the claim relating to the unlawful accumulation of the Light Tax Fund surplus had been mooted, as the surplus was being used to reduce light tax rates. At the conclusion of the litigation, the appellants applied for attorneys' fees on the grounds that the litigation had benefitted all taxpayers by providing them with millions of dollars in savings. The Court of Chancery denied the application and denied appellants' motion for re-argument on the denial of their fee application. Korn filed an appeal limited to the denial of his fee application.

On appeal, the appellants sought a $500,000 fee and provided evidence that $540,000 of the Light Tax Fund surplus had been used to reduce light tax rates. Appellants also submitted evidence showing that the surplus in the unlawful reserve accounts had been used to fund most of the projects that the $80 million bond sale was intended to cover, and that the abandonment of the bond sale had saved the county between $26 and $37 million. The appellees, in response, argued that any "purported 'savings'" from the decision to abandon the bond sale were more than offset by other expenses that resulted from that decision. They offered no similar response and analysis for the Light Tax Fund surplus except to assert that the county had "voluntarily" corrected the problem after Korn filed suit.

The trial court, in addressing the denial of the fee award on re-argument, did not explicitly address whether the "common fund doctrine" should apply in the context of a taxpayer suit because it found that any tangible monetary benefits stemming from the

23

appellants' litigation were "too speculative" to support a fee award.[64] The trial court also declined appellants' invitation to expand the corporate benefit exception to include a "taxpayer's benefit doctrine" regarding the creation of any "intangible benefits."[65] Echoing our holding in *Dover*, the trial court acknowledged the intangible benefit to the citizenry that occurs "when its elected officials are forced to conform their actions to the dictates of law."[66] But it concluded that the "good government" result achieved was "not the type of benefit that supports a common-law exception to the American Rule[.]"[67] Accordingly, the trial court concluded that:

> The parties disagree vigorously about whether the corporate benefit doctrine should be expanded in this manner and, if so, what the parameters of such a taxpayer benefit doctrine should be. Because I conclude that, even if such a doctrine were created and applied here, the circumstances of this case make an award of fees and costs inappropriate, I need not (and thus do not) address under what circumstances (and to what extent) a corollary to the common benefit doctrine should apply in the taxpayer-suit context.[68]

On appeal, we narrowly framed the issue observing that the Court of Chancery "did not address the question of whether the common benefit exception to the [American] rule should be applied in the context of a *taxpayer suit*."[69] In analyzing the applicability

---

[64] *Korn v. New Castle Cnty.*, 2006 WL 588041, at *2 (holding that "[t]o conjecture that reducing taxes or [cancelling] bond issuances in favor of spending down reserves has worked a calculable economic benefit to taxpayers requires speculation too profound to support an exception to the general American rule on fees.").

[65] *Id.* at *1, *3.

[66] *Id.* at *3.

[67] *Id.*

[68] *Id.* at *2.

[69] *Korn*, 922 A.2d at 412 (emphasis added).

24

of the common benefit doctrine in this taxpayer suit context, we agreed with the trial court that the abandoned bond sale "savings" for the county (which ranged from $26 to $37 million) were too speculative to be considered a monetary benefit in the fee award analysis.[70]  We held, however, that the application of the Light Tax Fund surplus to the light tax rate provided the taxpayers with a "substantial" and "quantifiable" benefit — namely, about $540,000 in savings as those funds were used to reduce all taxpayers' light rate.  Thus, we held that when a social benefit is created *and* when the "litigation also created a *substantial and quantifiable benefit to all taxpayers*,"[71] fee shifting may be appropriate under the common benefit doctrine.  We distinguished the factual context in *Dover* by stating that "Korn did more than merely achieve the social benefit that invariably results when a government agency is required to do its job[,]"[72] and that "Korn's litigation also created a substantial and quantifiable monetary benefit to all taxpayers[.]"[73]  The Court remanded the case to the Court of Chancery to determine an appropriate fee award.

### B.  *We Reject the Court of Chancery's Expansion of Dover*

Turning back to this case, we now consider Appellants' argument that the Court of Chancery's orders directly contravene *Dover*.

---

[70] At the risk of adding to the confusion in labeling the various doctrines and exceptions, like the Vice Chancellor, we use the more generic, inclusive phrase, "common benefit doctrine" in our discussion of *Korn*.  Except where quoting the opinion, we attempt to avoid using *Korn's* terminology — the "common benefit exception."

[71] *Korn*, 922 A.2d at 413 (emphasis added).

[72] *Id.*

[73] *Id.*

*1. The Litigation Compelled the Government to Perform Properly*

Appellants contend that the underlying litigation essentially was a suit to compel the county governments to "perform properly," and that because *Dover* holds that merely compelling a government entity to "perform properly" is not enough to trigger an exception to the American Rule, the fee award must be reversed. Appellees respond that the Entitlement Order is consistent with *Dover* because there were, in fact, other benefits resulting from this litigation besides causing the government to perform properly.

As we see it, the crux of the matter is whether the Court of Chancery's holding exceeds the bounds of *Dover* and in particular, whether the benefits achieved are fairly beyond the realm of causing the County Defendants to "perform properly." Although the Entitlement Order discusses the benefits achieved by the litigation, it omits any discussion of the guidance we offered in *Dover* as to the narrow parameters of the exception in the public interest context. Viewing this litigation through the prism of *Dover*'s guidance, we conclude that the benefits achieved fall within *Dover's* "perform properly" bounds. Accordingly, we hold that the trial court erred in determining that the common benefit doctrine applied.

We start with the general rule — the American Rule — that "[o]rdinarily, a litigant must, himself, defray the cost of being represented by counsel."[74] Exceptions to the

---

[74] *Chrysler Corp.,* 223 A.2d at 386; *see also Tandycrafts*, 562 A.2d at 1164 ("The starting principle is recognition of the so-called American Rule, under which a prevailing party is responsible for the payment of his own counsel fees in the absence of statutory authority or contractual undertaking to the contrary.").

American Rule are construed narrowly,[75] and "Delaware courts have been very cautious in granting exceptions to this rule[.]"[76]  In *Dover*, consistent with this narrowing principle, we declined to extend the corporate benefit exception where the benefit achieved was limited to causing the government to perform properly.  Noting that our courts disfavor expanding judicially-created exceptions to the American Rule, we cautioned in *Dover* that:

> In the public interest litigation context, absent legislative authorization, fee-shifting applications are disfavored.  Historically, our courts have been cautious about creating and expanding judge-made exceptions to the American Rule absent express and clear legislative guidance.  Here, to the extent this lawsuit caused the DPC to perform properly, it clearly created a social benefit.  But, that benefit is not of the kind that justifies creating a new *judge*-made exception to the American Rule.[77]

In other words, in *Dover*, even though the litigation provided a public benefit by compelling the DPC to "perform properly," this benefit alone did not warrant the creation of a judge-made exception to the American Rule.

Here, Appellees' lawsuit similarly compelled the County Defendants to "perform properly" by addressing the counties' violations of the True Value Statute and the Uniformity Clause.  Appellees have acknowledged that the litigation was "a public-interest case" brought for the purpose of "getting compliance with the law."[78]  The benefit achieved

---

[75] *See Arbitrium*, 705 A.2d at 231 ("'[t]he American Rule would be eviscerated if every decision holding defendants liable for fraud or the like also awarded attorney's fees.'  For that reason this quite narrow exception is applied in only the most egregious instances of fraud or overreaching.") (quoting *Barrows v. Bowen*, 1994 WL 514868, at *2 (Del. Ch. 1994))); *see also Tandycrafts*, 562 A.2d at 1164 ("While decisional-based expectations have evolved sparingly, it is now established that 'fee-shifting' may be required in certain restricted cases.").

[76] *Weinberger v. UOP, Inc.*, 517 A.2d 653, 654 (Del. Ch. 1986).

[77] *Dover*, 902 A.2d at 1091 (internal citations omitted) (emphasis in original).

[78] A599 (Transcript of March 11, 2022 Oral Argument).  *See generally*, A501 (Opening Brief of Appellees in Support of their Motion for Attorneys' Fees and Expenses) (May 10, 2021) ("From

27

by Appellees — compelling the defendants to "perform properly" — according to *Dover*, is insufficient to warrant a fee award.

We are not persuaded that the other benefits identified by the trial court sufficiently extend beyond *Dover*'s bounds of compelling the government to "perform properly." For one thing, some of the benefits are speculative. For example, Appellees contend that the primary benefit stemming from the litigation is the nineteen school districts' "optionality" to receive millions of more dollars per year in funding on account of the reassessments. As we explain in our discussion of *Korn*,[79] this optionality is speculative because school districts must act to increase taxes and some districts may choose not to raise taxes potentially fearing voter backlash or other reasons.

The trial court identified as another benefit the fact that the updated reassessments will make it easier for the counties to keep their assessments current in future — thereby increasing the tax base and obviating the need for school districts to call referenda every three to five years to keep pace with inflation. Yet we see this benefit as part of the county governments being required to "perform properly." And as for reestablishing "vertical

Original Plaintiffs' perspective, the case should have been simple because the counties' violations of the True Value Statute and Uniformity Clause were clear, and there was only one plausible corrective."); A181–A182 (Verified Complaint) (Jan. 16, 2018) ("[the True Value Statute] requires that each property be assessed for tax purposes at its 'true value in money[]' . . . . Plaintiffs are entitled to an order that will require compliance with [the True Value Statute]"); B047 (Amended Complaint) (Dec. 26, 2018) ("Plaintiffs are entitled to an order that will require compliance with [the Uniformity Clause]."); *DEO III*, 239 A.3d at 463 ("The NAACP-DE and the DEO proved at trial that when preparing their assessment rolls, the counties fail to comply with two legal requirements. First, under the . . . [True Value Statute] . . . . Second, under the Delaware Constitution['s] [Uniformity Clause].").

[79] *See infra* at 36.

equity" in the tax system,[80] this benefit is also best viewed as the kind of overarching social benefit that results when a government entity is caused to comply with the laws at issue here, namely, the True Value Statute and the Uniformity Clause. As such, the "vertical equity" benefit is also within *Dover*'s bounds. In short, in evaluating the thrust of the litigation and the nature of the benefits identified by the trial court, we view the present case as falling within the bounds of *Dover*'s restriction on awarding fees for causing a government to perform properly. Accordingly, we view *Dover* as controlling, and we hold that the Court of Chancery erred in not giving effect to *Dover*'s restriction on awarding fees for causing the government to perform properly.

2. *Dover Rejected the Private Attorney General Exception to the American Rule*

Appellants' related argument concerning the private attorney general exception takes similar aim at Appellees' view that the benefits achieved by the litigation go beyond the social good of requiring the counties to comply with the law. Appellants see the decision below as circumventing our explicit rejection of that exception in *Dover*.

---

[80] The trial court detailed the "regressive" tax system resulting from outdated property assessments:

> [B]y using tax assessments from decades ago, the counties created a system in which residents whose properties had appreciated more paid far less than their fair share of taxes, while residents whose properties had appreciated less paid far more than their fair share of taxes . . . . [R]esulting in a regressive system in which owners of lower-valued properties bear a greater relative share of the tax burden.

Entitlement Order at 9–10, ¶ 21.

In *Alyeska*,[81] the United States Supreme Court resolved a federal circuit split[82] by declining to adopt, by judicial decree, the private attorney general exception to the American Rule. The Supreme Court expressed concern that, absent statutory authorization, authority to make such fee awards would allow courts freedom to "pick and choose among plaintiffs and the statutes under which they sue and to award fees in some cases but not in others, depending upon the courts' assessment of the importance of the public policies involved in particular cases."[83] Similarly, this Court in *Dover* declined to adopt the private attorney general exception because it did not want to create a judge-made exception to fee shifting absent any express and clear legislative guidance from the General Assembly.[84] As noted in *Dover*, the private attorney general exception has been rejected by courts in a number of states.[85]

---

[81] *Alyeska*, 421 U.S. 240 (1975). The United States Supreme Court stated:

> [C]ongressional utilization of the private-attorney-general concept can in no sense be construed as a grant of authority to the Judiciary to jettison the traditional rule against nonstatutory allowances to the prevailing party and to award attorneys' fees whenever the courts deem the public policy furthered by a particular statute important enough to warrant the award.

421 U.S. at 263.

[82] *Id.* at 270 n.46.

[83] *Id.* at 269. The Court further held that only Congress, and not the federal courts, should authorize a "private attorney general" exception to the American Rule and that attorneys' fees are not ordinarily recoverable by the prevailing litigant in federal litigation in the absence of statutory authorization. *Id.* at 269–70.

[84] *Dover*, 902 A.2d at 1091. *See also Walsh v. Hotel Corp. of Am.*, 231 A.2d 458, 462 (Del. 1967) ("In Delaware, ordinary Court costs are usually allowed to the prevailing party, but counsel fees as part of allowable costs are exceptions . . . . Wisely, our Courts have been very cautious in approving exceptions to that general rule.") (internal quotation marks and citation omitted)).

[85] *See, e.g., Doe v. State*, 579 A.2d 37, 48 (Conn. 1990) ("[W]e [conclude] . . . that it is inappropriate for the judiciary to establish under the private attorney general doctrine a broad rule permitting such fees whenever a private litigant has at substantial cost to himself succeeded in

30

Appellants point to the trial court's "expansive view" of the beneficiaries of the litigation (such as the school and vocational districts, some taxpayers, the counties, and all county residents) as evidence that the trial court, in essence, applied the private attorney general exception. They argue that the notion that all county residents benefit from this

enforcing a significant social policy that may benefit others.") (internal quotation marks and citation omitted)); *League of Women Voters of Fla. v. Detzner*, 188 So.3d 68, 74 (Fla. Dist. Ct. App. 2016) ("We agree with and adopt the reasoning of those courts that have declined to adopt the private attorney general doctrine. We conclude, as they did, that the policy judgments underlying the doctrine are those that should be made by the legislative branch of government, not the judicial branch."); *Hamer v. Kirk*, 356 N.E.2d 524, 528 (Ill. 1976) (reversing a lower court's award of attorneys' fees in a class action suit brought by taxpayers: "the Supreme Court [in *Alyeska*] reversed [a fee award], holding that 'it would be inappropriate for the Judiciary, without legislative guidance, to reallocate the burdens of litigation in the manner and to the extent urged by respondents and approved by the Court of Appeals[,]'    . . . such a determination by this court would be equally inappropriate.") (citing *Alyeska*, 421 U.S. at 247)); *Pearson v. Bd. of Health of Chicopee*, 525 N.E.2d 400, 402 (Mass. 1988) (declining to adopt the private attorney general exception after plaintiffs sued the local board of health for violating statutory requirements: "[t]he plaintiffs ask us to adopt the private attorney general theory and hold that attorneys' fees are recoverable in suits to enforce the open meeting law. We decline to do so."); *Nemeth v. Abonmarche Dev., Inc.*, 576 N.W.2d 641, 653 (Mich. 1998) (rejecting a fee award sought under a state environmental protection law by holding that the law did not implicitly codify the private attorney general exception; the court declined to adopt the private attorney general exception to the American Rule in accordance with the Supreme Court's reasoning in *Alyeska*) (citing *Alyeska*, 421 U.S. 263–64)); *Jesurum v. WBTSCC Ltd. P'ship*, 151 A.3d 949, 961 (N.H. 2016) ("we are not persuaded that rewarding one party's advancement of the public interest by shifting fees to opposing parties . . . so clearly represents sound public policy that it is proper for us to adopt such a rule by judicial decision."); *Paz v. Tijerina*, 165 P.3d 1167, 1172 (N.M. Ct. App. 2007) ("Allowing the attorney fees award to stand would create an exception that is not narrow in scope and thus contrary to the long-established American rule recognized in New Mexico.") (citing *N.M. Right to Choose/NARAL v. Johnson,* 986 P.2d 450 (N.M. 1999) (declining to adopt the private attorney general doctrine)); *Jones v. Muir*, 515 A.2d 855, 862 (Pa. 1986) ("Since public interest litigation is not one of the traditional, judicially created bases for an award of attorney's fees, and the General Assembly has chosen to govern the awarding of attorney's fees, we therefore conclude that the power to authorize awards of attorney's fees under the private attorney-general theory, rests exclusively in the General Assembly."); *Providence Journal Co. v. Mason*, 359 A.2d 682, 688 (R.I. 1976) ("We apply the rationale in [*Alyeska*] to the case under consideration . . . . The Legislature has not enacted any such provision for the award of attorneys' fees under the [statute at issue]. The award of such fees is a prerogative of the Legislature and not this court. The trial justice was correct in reversing the commission's award of attorneys' fees.").

31

litigation undermines the application of the common benefit doctrine and, instead, more accurately describes a feature of the private attorney general exception.[86] The DLLG, in its amicus brief, largely echoes Appellants' critiques concerning an "undeclared invocation of the 'private attorney general' doctrine[.]"[87]

Appellees, on the other hand, contend that the trial court's "thorough explanation" of the benefits stemming from this litigation demonstrates that it did not depart from precedent by establishing a judge-made formulation of the common benefit doctrine.[88] They disagree with Appellants' contention that an affirmance would incentivize public interest litigants to circumvent elected officials to achieve their goals and would open the "floodgates" for policy dispute cases. They further respond that this case is not a policy dispute about reassessment but, rather, an action to enforce obligations under existing law brought by plaintiffs who have standing.[89]

---

[86] Opening Br. at 37 (citing *Stevens v. Mun. Ct. for San Jose-Milpitas Jud. Dist.*, 603 F.2d 111, 113 (9th Cir. 1979) ("The common benefit exception to the rule has no application to a benefit to all citizens of a county . . . for such a broad class would merge the exception into the private-attorney-general concept rejected in *Alyeska* . . . .")). *See also Satoskar v. Ind. Real Est. Comm'n*, 517 F.2d 696, 698 (7th Cir. 1975), *cert. denied* 423 U.S. 928 (1975) ("[if] all citizens have in fact benefited from the vindication of constitutional principles, the 'common benefit' theory would merge into the 'private attorney general' approach, which . . . has been rejected by the Court in [*Alyeska*].").

[87] Amicus Br. at 18 (internal citation omitted).

[88] Answering Br. at 38–39; *see also id.* at 41 ("The judicial function is to interpret the law and apply its remedies and penalties in particular cases . . . . All courts shall be open . . . [s]uits may be brought against the State, according to such regulations as shall be made by law.") (internal quotation marks and citations omitted)).

[89] *Id.* at 42 ("Judicial involvement was requested because inaction had been the counties' long-term response to concerns arising from their violations of the True Value Statute and the Uniformity Clause, and the problems for Delaware schools caused by those violations.") (internal citation omitted)).

As we noted above, we view the Court of Chancery's list of benefits resulting from this litigation as the types of broad-based societal benefits that flow from causing a government to comply with the law.[90] The court justified awarding the private plaintiffs fees on some of the same grounds relied upon by courts applying the private attorney general exception, including, for example, rewarding plaintiffs for effectuating policies that benefit the citizens at large.[91] Here, for example, the trial court justified the award on the grounds that: "[p]ublic policy supports providing an incentive for litigants like the plaintiffs who take on difficult statutory and constitutional issues like those litigated in the County Track."[92] Additionally, because Appellees had mounted a meaningful challenge to this broken system, the court reasoned that "[i]f there ever was a setting that called for

---

[90] *See, e.g.*, *Alyeska*, 421 U.S. at 264, n.39 (the common benefit theory "ill suits litigation in which the purported benefits accrue to the general public."); *Jones v. Muir*, 515 A.2d at 861 ("In the present case the purported benefits of appellees litigation were supposed to accrue to the general public. Thus the circumstances here do not justify application of the common benefit theory.").

[91] The trial court's justifications for granting the fee award parallel factors considered by other jurisdictions that recognize the private attorney general exception. For example, in *Community Association for North Shore Conservation*, the Montana Supreme Court, in declining to award fees under the private attorney general exception, held that it was limited to cases vindicating constitutional interests. In its general discussion of the exception, it observed that:

> Courts should consider three factors in determining whether to award attorney fees under the private attorney doctrine: (1) the strength or societal importance of the public policy vindicated by the litigation, (2) the necessity for private enforcement and the magnitude of the resultant burden on the plaintiff, (3) the number of people standing to benefit from the decision.

*Cmty. Ass'n for N. Shore Conservation, Inc. v. Flathead Cnty. et al.*, 445 P.3d 1195, 1208 (Mont. 2019) (internal quotation marks and citation omitted). *See also Goo v. Arakawa*, 321 P.3d 655, 669 (Haw. 2014) (considering the same three factors used by the Montana Supreme Court and adding that "[t]he private attorney general doctrine is an equitable rule that allows courts in their discretion to award [attorneys'] fees to plaintiffs who have vindicated important public rights.") (internal quotation marks and citation omitted)).

[92] Entitlement Order at 6, ¶ 13.

rewarding courageous plaintiffs for litigating, this was it."[93]   The court also praised

Appellees' societal contributions stemming from this litigation: "[t]he litigation that the

plaintiffs pursued is the type of socially beneficial litigation that should be rewarded."[94]

Although we do not disparage Appellees' litigation efforts, we do not agree that the

types of broad-based societal benefits identified by the court justify the creation of another

judge-made exception to the American Rule.  Accordingly, our prior decision in *Dover*

controls.  Appellees have not suggested that we revisit it.  Nor do we see any reason to do

so.  Thus, well-established principles of *stare decisis* compel our adherence to it.[95]

Delaware is not alone in its rejection of the private attorney general exception.

Various jurisdictions have identified the legitimate concerns associated with applying this

doctrine.  One concern, as recognized by the Supreme Court in *Alyeska* and this Court in

*Dover*, is that the legislative branch is best equipped to create new exceptions to the

---

[93] *Id.* at 7, ¶ 14.  The trial court's reasoning in *DEO III* aligns with the justifications for the private attorney general exception:

> An individual plaintiff might theoretically sue on a class-wide basis, but it would take a brave and civic-minded person to assert the claim . . . . Few people like having their taxes raised, and it is hard to imagine an individual suing to fix a dysfunctional system when the outcome could irritate as many as half of her fellow property owners.

*DEO III*, 239 A.3d at 539

[94] Entitlement Order at 8, ¶ 15.

[95] *See Brookfield Asset Mgmt., Inc. v. Rosson*, 261 A.3d 1251, 1278 (Del. 2021) ("[*stare decisis*] is an important feature of Delaware law and of judicial restraint . . . '[u]nder the doctrine of *stare decisis*, settled law is overruled only for urgent reasons and upon clear manifestation of error.'") (quoting *Seinfeld v. Verizon Commc'ns, Inc.*, 909 A.2d 117, 124 (Del. 2006) (internal quotation marks and citation omitted)).

American Rule in public interest litigation.[96]  The Indiana Supreme Court in *Town of St. John* declined to award fees to plaintiffs who proved that Indiana's real property assessment scheme was unconstitutional.  In rejecting plaintiffs' private attorney general theory, that court reiterated the New Mexico Supreme Court's concern with the private attorney general exception:

> Unbridled judicial authority to "pick and choose" which plaintiffs and causes of action merit an award of attorney fees under the private attorney general doctrine would not promote equal access to the courts for the resolution of good faith disputes inasmuch as it lacks sufficient guidelines to prevent courts from treating similarly situated parties differently and could easily result in decisions that favor a particular class of private litigants while unduly discouraging the government from mounting a good faith defense. Such authority also would not promote the goal of conserving judicial resources inasmuch as it calls for the courts to engage in a fact-specific reexamination of the merits of a case to determine the significance and scope of the rights that have been protected.[97]

We agree that applying the private attorney general exception could lead to arbitrary, unpredictable results as there is no firm guidance for judges to follow in determining whether a cause or social policy is sufficiently worthy to warrant a fee award. Accepting the private attorney general exception could incentivize opportunistic litigants to file suits against government entities and public officials to effect policy change, thereby bypassing the General Assembly.  For these additional reasons, we adhere to our rejection of that exception in *Dover*.

---

[96] *Alyeska*, 421 U.S. at 263–64; *id.* at 271 (observing that the American Rule is "deeply rooted in our history and congressional policy[,]" and that it is not for the Supreme Court "to invade the legislature's province by redistributing litigation costs[.]"); *Dover*, 902 A.2d at 1091.

[97] *State Bd. of Tax Comm'rs v. Town of St. John*, 751 N.E.2d 657, 661 (Ind. 2001) (quoting *N.M. Right to Choose*, 986 P.2d at 459).

### C. *Korn is Limited to Taxpayer Suits*

The trial court centered most of its analysis on *Korn* and determined that *Korn* was not limited to taxpayer suits, but rather, it applied more broadly to public interest suits. Appellants maintain that the expansion of the common benefit doctrine in *Korn* is limited to taxpayer suits and because the current litigation is not a taxpayer suit, the trial court misapplied *Korn*. They say that even if this were a taxpayer suit, Appellees, nonetheless, have failed to satisfy the requirements of *Korn*. Appellants argue that the *Korn* factors are not met because there are no quantifiable benefits inuring to the benefit of all taxpayers:

> Plaintiffs were incapable of identifying the taxpayers benefitted or quantifying any benefit provided to taxpayers and abandoned any argument that they were entitled to fees based on taxpayer benefit. The Court of Chancery concluded that some taxpayers will benefit from reassessment if their tax liability is reduced, but failed to quantify that benefit and then incorrectly concluded that Plaintiffs' fees should be borne by **all** County taxpayers, not just benefitted taxpayers. By requiring all taxpayers to bear the burden of unquantified benefits to a subset of taxpayers, the Court of Chancery "sanction[ed] the invidious treatment of [taxpayers], which [is] *inequitable* and . . . lead[s] to the absurd result of exposing [taxpayers] to non-*pro rata* liability" for Plaintiffs' fees.[98]

Appellants also point out that, unlike in *Korn* where there was a benefit for all taxpayers, here it is "axiomatic that some taxpayers will not benefit if taxes are raised because they will pay higher taxes."[99]

Appellees criticize Appellants' overly "narrow" interpretation of *Korn* and argue

---

[98] Opening Br. at 25–26 (emphasis in original) (internal citations omitted) (quoting *City of Miami Gen. Emps.' & Sanitation Emps.' Ret. Tr. v. C&J Energy Servs., Inc.*, 2018 WL 508583, at \*7 (Del. Ch. 2018)).

[99] Reply Br. at 11; *see also* Entitlement Order at 10, ¶ 21 ("It is true, of course, that other taxpayers will see their tax bills go up . . . .").

that the Court of Chancery was correct in holding that the common benefit doctrine applies

not only to taxpayer suits, but broadly in any public interest litigation:

> Defendants point to no language in [*Korn*] indicating that taxpayer suits were to be treated differently than other public interest suits for purposes of the common benefit exception. Nor do Defendants offer any reasonable (or, for that matter, unreasonable) basis for a court to apply the exception differently in taxpayer suits and other public interest suits or suggest any difference between the *Korn* litigation and the instant case that would render the rationale of the common benefit exception applicable to support a fee in the *Korn* litigation but not the instant case.[100]

Appellees argue that the trial court was correct in its holding that "[t]he Entitlement

Order did not create a new exception[,] [t]he court applied the Delaware Supreme Court's

decision in *Korn* in conjunction with long-standing equitable principles governing fee

awards."[101] Appellees' fallback argument is that if this Court were to determine that *Korn*

applies only to taxpayer suits, the Court of Chancery's error would be harmless because

this present matter is a taxpayer suit.[102] Although they did not raise taxpayer standing

below, they assert on appeal that they have taxpayer standing: "[Appellees], who brought

this action using associational and organizational standing, respectively, are properly

---

[100] Answering Br. at 17.

[101] B297 (Memorandum Opinion denying Appellants' request for certification of an interlocutory appeal, p. 23).

[102] Although Appellees did not assert taxpayer standing in the proceedings below, Appellees, on appeal, now claim that this present case is a taxpayer suit:

> The instant case is a taxpayer suit. Its focus was on whether public funds were being used to collect taxes legally, not on the process by which tax collection decisions were made. Plaintiff sought declaratory and injunctive relief that would have prevented Defendants' collection of taxes, absent a settlement that would result in countywide reassessments making property tax collection legal . . . . It meets *Lechliter*'s description of a taxpayer suit."

Answering Br. at 20–21 (internal citation omitted).

treated as taxpayers for the purpose of determining whether this is a taxpayer suit, since they had taxpayer standing to challenge illegal county action."[103]

We hold that the trial court erred in determining that *Korn* applies more broadly in the arena of public interest litigation. We decline to extend *Korn* beyond taxpayer suits that confer a quantifiable, non-speculative benefit to all taxpayers. We also reject Appellees' newly-raised argument that this case is a taxpayer suit. As we explain below, *Korn* does not apply and cannot serve as the basis for a fee award in this case.

### 1. *We Decline to Broaden Korn Beyond Taxpayer Suits*

*Korn* was a taxpayer suit in which a taxpayer challenged the expenditure of public funds. In holding that the "common benefit exception" applied to taxpayer suits, this Court stated:

> [W]e consider whether taxpayers may recover attorneys' fees if their litigation satisfies the requirements of the so-called "common benefit" exception to the [American] rule, under which each party bears its own attorneys' fees . . . . We hold that the rationale of the common benefit exception *applies to taxpayer suits* that result in a quantifiable monetary benefit for all taxpayers.[104]

Thus, fees may be shifted in taxpayer suits when the suit yields a quantifiable, non-speculative monetary benefit for all taxpayers. We do not read *Korn* as applying more generally in public interest suits.

Appellees point to comments made by the Court of Chancery after we remanded the

---

[103] *Id.* at 23 (internal citation omitted).

[104] *Korn*, 922 A.2d at 410 (emphasis added).

case in *Korn* as evidence that *Korn*'s scope is more expansive. On remand,[105] Chancellor Chandler remarked that: "[u]nder the Supreme Court's holding in [*Korn*], local governments face a new financial risk because plaintiff's attorneys are now incentivized to bring public interest lawsuits."[106] Appellees read those comments to mean that *Korn* applied to all public interest suits.[107] However, the issue in *Korn* was narrowly framed as to whether the "common benefit exception" applies in the context of taxpayer suits, and in answering that question, we held in *Korn* that the "common benefit exception applies to taxpayer suits[.]"[108] On remand, the Court of Chancery was obviously bound by this Court's ruling, and thus, we do not read the former Chancellor's comments as suggesting that the exception applies outside the context of taxpayer suits.

Moreover, expanding the application of the common fund doctrine to all public interest suits in *Korn* would have been inconsistent with this Court's decision in *Dover* issued during the preceding year. In *Dover*, in the context of the related corporate benefit exception, we emphasized that "[t]he corporate benefit exception to the American Rule is typically applied in business enterprise litigation . . . . In the public interest litigation context, absent legislative authorization, fee-shifting applications are disfavored."[109] Thus,

---

[105] 2007 WL 2981939 (Del. Ch. 2007). We note that the Chancellor, in describing our holding in *Korn*, stated that "the Supreme Court has now held that the common benefit exception can apply in the context of a taxpayer's suit and does apply in this case." *Id*. at *2 (internal citation omitted).

[106] *Id.* at *2.

[107] Answering Br. at 18.

[108] *Korn*, 922 A.2d at 410.

[109] *Dover*, 902 A.2d at 1091 (internal citation omitted).

our general disinclination to fashion more expansive exceptions to the American Rule supports our conclusion that the narrower reading proffered by Appellants is correct.

### 2. *This is not a Taxpayer Suit and, therefore, Korn Does not Apply*

Although standing was an issue that was litigated below, Appellees never argued in the proceedings below that they had taxpayer standing.[110]  Because this Court's practice is to only address issues that are fairly presented below,[111] Appellees have waived this argument.  But even if not waived, this case is not a taxpayer suit.

"Taxpayer standing in Delaware is 'reserved for a narrow set of claims involving challenges either to expenditure of public funds or use of public lands.'"[112]  Here, Appellees were not challenging the use or expenditure of public funds to collect taxes but, rather, they sought a ruling that the County Defendants were violating the True Value Statute and the Uniformity Clause through their use of outdated property assessments.[113]  The focus of

---

[110] The trial court noted in *DEO I* that "[d]uring oral argument, on reply, New Castle County argued for the first time that the plaintiffs lacked standing to pursue Count III."  *DEO I*, 2018 WL 4849935, at *11.  In *DEO III*, the trial court stated:  "[t]he plaintiffs do not rely on taxpayer standing in this case[.]"  *DEO III*, 239 A.3d at 512.

The Court of Chancery observed that DEO relied on the doctrine of associational standing and the NAACP-DE argued it had standing to sue in its own right for injury to its organizational interests. *DEO III*, 239 A.3d at 513.  The trial court determined that DEO had associational standing to assert claims against the counties for violating the Uniformity Clause and the True Value Statute and the NAACP-DE had standing under the doctrine of organizational standing.  *Id.* at 537–38.  These determinations are not challenged on appeal.

[111] *See* Del. Supr. Ct. R. 8 ("Only questions fairly presented to the trial court may be presented for review[.]").

[112] *Reeder*, 974 A.2d 858, 2009 WL 1525945, at *2 (quoting *O'Neill*, 2006 WL 205071, at *19). *See also City of Wilmington v. Lord*, 378 A.2d 635, 637 (Del. 1977) ("A taxpayer has a direct interest in the proper use and allocation of tax receipts.  That interest gives the taxpayer a sufficient stake in the outcome of the suit to allow him to challenge improper uses of tax funds.")).

[113] *DEO III*, 239 A.3d at 464–65.

taxpayer cases is "whether use of public funds or property itself is legal, not merely on the process by which decisions regarding such use are made — otherwise, the breadth of taxpayer standing would be near-limitless."[114]

Appellees' new assertion on appeal that this case is a taxpayer suit because its focus was on "whether public funds were being used to collect taxes legally, not on the process by which tax collection decisions were made[]" is not convincing.[115] It is inconsistent with how Appellees presented their case below.[116] For example, their Amended Complaint sought to enjoin the County Defendants from violating the True Value Statute and the Uniformity Clause.[117] They centered their litigation challenge on the use of outdated property tax assessments, not on the expenditure of funds involved in the tax collection

---

[114] *See Lechliter v. Del. Dep't of Nat. Res. Div. of Parks and Recreation*, 2015 WL 7720277, at *7 (Del. Ch. 2015). *See also Nichols v. City of Rehoboth Beach*, 836 F.3d 275, 281 (3d Cir. 2016) (where plaintiff was not "contesting the expenditure of tax funds," but was challenging the legality of a special election which authorized certain revenue bonds, plaintiff lacked taxpayer standing.).

[115] Answering Br. at 20.

[116] *See e.g., DEO III*, 239 A.3d at 463 ("The NAACP-DE and the DEO proved at trial that when preparing their assessment rolls, the counties fail to comply with two legal requirements. First, under the . . . [True Value Statute] . . . . Second, under the Delaware Constitution['s] [Uniformity Clause]"); *id.* at 536 ("The DEO has standing to assert claims against the counties for violating the Uniformity Clause and the True Value Statute."); *id.* at 537–38 ("Through this lawsuit, NAACP-DE seeks to address a longstanding problem with the funding of Delaware's public schools: the absence of a fair and equitable system of property tax assessment.").

In their briefing before the Court of Chancery, Appellees stated that "Plaintiffs' interests are not in their own individual property assessments." A274. *See Fuller v. Volk*, 351 F.2d 323, 327 (3d Cir. 1965) ("in order for the taxpayer to have standing, he must show that his position as a taxpayer is in some way affected[.]").

[117] B048 (Amended Complaint) (Dec. 26, 2018).

41

process.[118]  At oral argument on their fee application, Appellees described their case as a "public-interest case" where the County Defendants were opposed to "getting compliance with the law."[119]  A fair reading of the record before us convinces us that Appellees' focus has remained steadfastly on increasing school funding for disadvantaged students by compelling the defendant county governments to conform the methodology by which they assess taxes to the requirements of the law.  Consequently, this case is not and was not litigated as a taxpayer suit.

### 3. Even if This Case were a Taxpayer Suit, it Does Not Meet the Standard Set Forth in Korn

In any event, *Korn* is not satisfied for at least two other reasons.  First, *Korn* is limited to taxpayer suits where there is a quantifiable, non-speculative monetary benefit for all taxpayers.[120]  Here, the monetary benefits identified by Appellees — the "optionality" of increased tax revenue when the reassessments are completed in the coming years — were speculative.  Second, there is an identity of interest problem in that the counties, which are being compelled to pay attorneys' fees, have not received a quantifiable, non-speculative monetary benefit.

First, as to whether there was a quantifiable, non-speculative monetary benefit, Appellees point to the trial court's finding that the litigation provided "substantial benefits"

---

[118] *See, e.g.*, *Nichols*, 836 F.3d at 281 ("A plaintiff must therefore establish a municipal expenditure on the *challenged aspect* of the disputed practice in order to have municipal taxpayer standing.") (emphasis in original).

[119] A599 (Transcript of March 11, 2022 Oral Argument).

[120] *Korn*, 922 A.2d at 413.

to identifiable groups, as required by *Korn*:

> After the general reassessments, each of the sixteen local school districts will have the right to claim a 10% increase in property tax revenue without having to succeed in a tax referendum . . . and the three vocational-technical school districts will have the right to a 10% increase in property tax revenue without seeking legislative approval . . . . The additional revenue will make more funds available to support the needs of Disadvantaged Students, which will benefit all students . . . . The updated reassessments with current data also will make it easier for the counties to keep their assessments current in the future. When property assessments increase as property values appreciate, the resulting increases in the tax base will help mitigate the need for school districts to call referendums every three to five years, just to keep up with the effects of inflation, as was necessary under the broken system.[121]

Appellees also argue that the benefit to taxpayers from the reassessments' elimination of the counties' regressive property tax systems is not speculative. They point to the trial court's finding that the general assessments benefit other groups of beneficiaries by re-establishing "vertical-equity:"

> [B]y using tax assessments from decades ago, the counties created a system in which residents whose properties had appreciated more paid far less than their fair share of taxes, while residents whose properties had appreciated less paid far more than their fair share of taxes. Across all three counties, higher-valued properties were assessed at a lower percentage of fair market value than lower-valued properties, resulting in a regressive system in which owners of lower-valued properties bear a greater relative share of the tax burden . . . . The reassessment will re-establish vertical equity and restore price-related uniformity, thereby benefitting those disadvantaged taxpayers who were injured by the counties' regressive system.[122]

We do not agree that the benefits identified by Appellees and the trial court satisfy *Korn*'s requirement that the litigation must create a "substantial and quantifiable monetary benefit

---

[121] Entitlement Order at 8–9, ¶ 19 (internal citation omitted).

[122] *Id.* at 9–10, ¶ 21.

to all taxpayers."[123]

First, the speculative nature of the "optionality" for school districts to seek a 10% increase in funding runs afoul of *Korn's* "substantial and quantifiable" requirement. The 10% increase in funding is not self-effectuating. Rather, it must be approved by elected school board members and appointed vocational school board members. But as Appellants point out, it might be entirely rational not to accept the 10% increase as elected school board members could face backlash from voters who have their tax rates raised because of the reassessment.[124] Further, the trial court's determination that it would be "irrational" for school districts to not seek the additional funding is not supported by the record.[125]

Other benefits identified by the trial court (such as the enhanced educational benefits to students and parents) are contingent on the school districts seeking the 10% increase in funding. And because the reassessments have yet to occur, the vertical equity has not yet been realized. Therefore, although there are benefits identified by the trial court, they lack

---

[123] *Korn*, 922 A.2d at 413.

[124] Appellants argue that elected officials might rationally choose not to raise tax rates:

> Elected school board members — who face "backlash from voters confronted with recurring requests to have their taxes raised" **with** voter consent (through referenda) — might rationally think twice before raising school taxes **without** taxpayer consent following reassessment, given the general opposition to tax increases observed by the Court of Chancery, particularly if they may need to ask taxpayers to approve referenda in the future.

Opening Br. at 33 (quoting *DEO III*, 239 A.3d at 471) (emphasis in original) (internal citation omitted). *See also* 14 *Del. C.* §§ 1051(a); 1064(a); 1903; 1916(b); Entitlement Order at 8, ¶ 19.

[125] Specifically, the trial court held that the monetary benefit was not speculative because even though school districts are not required to accept a 10% increase in funding due to the reassessments, they are highly unlikely to reject the funding because that would be "irrational." *Id.* at 9, ¶ 20.

the substantial and quantifiable monetary characteristics that justify awarding attorneys' fees under *Korn*.[126]

Second, there is an identity of interest problem in that the entities from whom fees are sought, namely, the counties, have not received a quantifiable, non-speculative monetary benefit. The common benefit doctrine is premised upon the plaintiff and the beneficiaries sharing an identity of interest.[127] The trial court dispensed with Appellants' "identity of interest" argument by reasoning that the counties will benefit because they will be in compliance with the True Value Statute and the Uniformity Clause: "[b]ringing an organization into compliance with the law is a benefit to that organization, be it a corporation or a county."[128] The trial court also listed other benefits to the counties — the counties' residents will benefit from the more equitable tax system and there will be improved educational opportunities for the county residents.[129]

Appellants argue that there is no identity of interest between the beneficiaries of the

---

[126] Further, in *Korn*, the substantial and quantifiable monetary benefit to all taxpayers was a reduction in the taxpayers' light rate by $540,000. In this case, as the trial court noted, while some taxpayers' property tax bills will decrease, "other taxpayers will see their tax bills go up . . . ." Entitlement Order at 10, ¶ 21.

[127] *See Richman*, 185 A.2d at 885 ("Recovery of expenses in [corporate benefit exception] cases [are] predicated on the conferring of some benefit on the interested class and not merely on petitioner himself.").

[128] Entitlement Order at 10–11, ¶ 23 (citing *Chicago Milwaukee Corp.,* 560 A.2d 489, 1989 WL 27743, at *1 ("it is well established under Delaware law that when a transaction is corrected to comply with Delaware law, the corporation and all of its shareholders receive a benefit.")). *See also Mencher v. Sachs*, 164 A.2d 320, 323 (Del. 1960) ("Cancellation of illegally issued stock is in itself a benefit."); *Korn*, 922 A.2d at 413 (explaining that a social benefit "invariably results when a government agency is required to do its job.").

[129] *Id.* at 11, ¶ 23.

litigation and the County Defendants because the latter are political appointees whose only role is to collect and remit school taxes, not administer educational programs in schools. Appellees respond that there was an identity of interest because the County Defendants were sued in their official capacity; the County Defendants have overlapping interests with the other beneficiaries (such as the enhanced "wellbeing" of the counties); and, as the trial court noted, the County Defendants were best positioned to pay for legal fees.

To start, we reject the "best position" argument as it is untethered to the identity of interest principles.[130] As this Court stated in *Dover*, "[t]he purpose underlying . . . fee-shifting doctrines is to balance the equities to prevent 'persons who obtain the benefit of a lawsuit without contributing to its cost [from being] unjustly enriched at the successful litigant's expense.'"[131] "The common benefit doctrine does not operate as a generalized mechanism for achieving redistributive justice."[132] The beneficiaries here are the school districts and the disadvantaged students, not the County Defendants, who are political appointees, whose only role in public education is to collect and remit school taxes.

---

[130] The trial court in this matter explained that equity demands that the County Defendants bear the cost of attorneys' fees even if they were not beneficiaries of the litigation:

> The counties are optimally positioned to pay the award on behalf of their residents who will benefit. If the counties see fit, they can incorporate the cost of the fee award in the determination of a new tax rate, thereby ensuring that the residents who benefit from the corrected system of assessments bear the cost.

Entitlement Order at 12, ¶ 25.

[131] *Dover*, 902 A.2d at 1090 (quoting *Goodrich*, 681 A.2d at 1044).

[132] *Judy*, 2016 WL 4992687, at *15. Appellants criticize the trial court for focusing instead on which party had the "deep pockets." Opening Br. at 28 ("In other words, according to the Court of Chancery, under the common benefit exception, it is irrelevant who benefits, provided the defendants have deep pockets.").

Appellees' reliance on *First Interstate* is misplaced.[133] *First Interstate* arose out of efforts by Wells Fargo & Co. to acquire First Interstate Bancorp. Wells Fargo acquired First Interstate after the defendant directors ceased opposing Wells Fargo's hostile proposals and after they abandoned First Interstate's merger agreement with First Bank System, Inc.[134] Plaintiffs argued that these actions resulted in a benefit to the First Interstate stockholders. Plaintiffs filed a fee petition in connection with certain claims that had become moot.

The Court of Chancery recognized that, if recovery could be made only from the "common fund" represented by the increased consideration paid to First Interstate's stockholders, then no recovery was possible because that fund had been disbursed to them years earlier. The Court of Chancery ultimately required Wells Fargo to pay the fees because (i) the acquisition was for stock and thus, the stockholders of Wells Fargo were, in some substantial degree, former stockholders of First Interstate or their successors in interest; (ii) evidence suggested that Wells Fargo expected that First Interstate would be required to pay a fee to plaintiffs' counsel; and (iii) Wells Fargo benefitted from the plaintiffs' efforts to abandon the merger with First Bank. Consequently, the court held that the successor entity would be responsible for payment of attorneys' fees because "fee shifting is an equitable device and, as the circumstances presented here demonstrate, is not properly or easily confined to rigid, predictable circumstances[,]" and that it was "more

---

[133] Answering Br. at 29–33 (citing *First Interstate*, 756 A.2d 353).

[134] *First Interstate*, 756 A.2d at 356.

fair to require First Interstate to pay a fee to plaintiffs' counsel than to deny them any fee at all."[135]  Because no other source of payment was available, the court regarded the assets of First Interstate as being a fund belonging to the stockholders in common from which it was appropriate to pay plaintiffs a fee.  Because no analogous circumstances are present here, *First Interstate* is distinguishable.

Instead, the Court of Chancery's decision in *Mentor Graphics* is more analogous.[136] That case supports the notion that those who do not receive benefits of litigation should not be required to pay the fee award.[137]  The benefit in *Mentor Graphics* was the creation of a "common fund," resulting from an unsuccessful hostile bidder's litigation efforts (whereby it successfully invalidated one of the target's anti-takeover defenses) in attempting to acquire a target company.[138]  Although the target's stockholders received a benefit in the form of the increased consideration they realized for their shares, the unsuccessful bidder tried to recover attorneys' fees from the successful bidder who acquired the target, even though the successful bidder did not benefit from the common fund.[139]  The Court of Chancery did not require the successful bidder to pay the fee award and observed that

---

[135] *Id.* at 362.

[136] *Mentor Graphics Corp. v. Quickturn Design Sys., Inc.*, 789 A.2d 1216 (Del. Ch. 2001), *aff'd*, 818 A.2d 959 (Del. 2003).

[137] *Id.* at 1231 ("[Litigant]'s policy arguments are factually inapplicable to this case, because [Litigant] is not seeking to recover fees against from the persons who received the benefit[.]").

[138] *Id.* at 1226, 1233.

[139] *Id.* at 1233.  The court observed that Mentor was not seeking to recover fees from the persons who received the benefit, *i.e.*, the former target stockholders whose shares were purchased at a premium.  *Id.* at 1231.  Instead, Mentor was seeking fees from the winning bidder.  The court observed that "there is no basis in law or policy to force the winning bidder to pay the expenses of the loser."  *Id.*

holding otherwise "would be a totally unprincipled result which runs counter to the rationale that those who receive the benefit from a shareholder's litigative efforts should share the costs of creating that benefit."[140]   Here, the County Defendants, who did not directly benefit from the litigation should not be required to pay the fee award.

Thus, even if this case were a taxpayer suit, it does not meet the standard set forth in *Korn* because *Korn* is limited to taxpayer suits where there is a quantifiable, non-speculative monetary benefit for all taxpayers.  Further, the County Defendants were not the beneficiaries of Appellees' litigative efforts and should not be required to pay the fee award.

In sum, the litigation below was brought to compel the defendant governmental entities to perform properly.  Under our holding in *Dover*, fees cannot be awarded merely as a result of compelling the government to perform properly.  *Korn* expanded the common benefit doctrine to taxpayer suits, but this is not a taxpayer suit.  Even if it were, *Korn*'s requirements, including the requirement that the litigation create a quantifiable, non-speculative monetary benefit for all taxpayers, was not satisfied.

## IV.    CONCLUSION

For the reasons set forth above, we REVERSE the Court of Chancery's decision awarding attorneys' fees and AFFIRM its award of expenses.

---

[140] *Id.* at 1233.